UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHRISTINE HUNSAKER,

     Plaintiff,

v.                                CASE NO. 6:18-CV-1996-ORL-22DCI

FOUNDATION PARTNERS GROUP,
LLC,

     Defendant.

_____/

**DEFENDANT FOUNDATION PARTNERS GROUP, LLC'S MOTION
FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW**

     DEFENDANT FOUNDATION PARTNERS GROUP, LLC ("FPG" or "Defendant") hereby moves this Court for an Order granting summary judgment to Defendant as to each claim pled by Plaintiff CHRISTINE HUNSAKER ("Hunsaker" or "Plaintiff") in the Complaint (Dkt. 1). In support thereof, Defendant submits the following Memorandum of Law.

**I.    STATEMENT OF UNDISPUTED FACTS**

     FPG owns funeral homes, crematories, and cemeteries throughout the United States. (Dkt. 1, ¶13).[1] In 2017, FPG was in search of a Chief Operating Officer ("COO") to lead and oversee its field operations, sales, and marketing, and anticipated, as part of its succession planning, that the right candidate would eventually fill the role of Chief Executive Officer ("CEO") upon the retirement of current CEO Robert "Bob" Bukala. (Bukala 95:13-17). Plaintiff, a longtime funeral services professional, was introduced to FPG as a COO candidate by Chris Hamiel, an FPG

---

[1] All citations to the deposition testimony will be in the format "Last Name Page:Line." Citations to Plaintiff's deposition testimony will be in the format of "Pl. Page:Line." Citations to deposition exhibits will be in the form of "Last Name (or Pl.) Ex. X." Citations to Declarations will be in the format "Last Name Dec., ¶X."

employee and Plaintiff's former colleague.  (Bukala 86:3-11; Hamiel Dec., ¶3).  Hamiel told Bukala that Plaintiff was difficult to work with and had some conflicts in her previous roles, but could get results for FPG.  (Bukala 86:12-17; Hamiel Dec., ¶3).

### A. Bukala Hires Plaintiff Against the Urging of FPG's Senior Leaders and An Independent Executive Consultant.

Bukala was impressed by Plaintiff's experience and contacted her to discuss the position in early July 2017.  (Pl. 16:2-20; Bukala Dec., ¶3).  In August, he invited Plaintiff to FPG's corporate headquarters in Orlando, Florida to meet with members of the Company's Senior Leadership Team. (Pl. 23:22-24:22; Bukala Dec., ¶4).  Plaintiff also interviewed by telephone with certain FPG employees and with FPG Board Member Kevin McAllister ("McAllister"). (Farnstrom 54:4-14, 55:15-25; Clark 69:8-70:25; Pl. 154:8-19).

After meeting Plaintiff, both male and female members of the Senior Leadership Team expressed concerns to Bukala about Plaintiff's interpersonal skills and questioned whether she would be a good fit for the company; all but one urged Bukala not to hire Plaintiff.  (Bukala Dec., ¶4).  Julie Judge, head of Human Resources, strongly recommended that Bukala not hire Plaintiff, as Judge did not think Plaintiff would be a good cultural fit, and she did not think that Plaintiff had the temperament of a COO and eventual successor to the CEO. (Judge 184:6-8; Judge Dec., ¶3).

FPG engaged a third-party consultant, ghSmart, to conduct an executive assessment of Plaintiff. Its consultant Kimberly Powell ("Powell"), who has performed hundreds of such assessments, including for FPG and its parent company, performed the assessment. (Powell 9:17-20; 71:10-17).   Powell found Plaintiff to have a dictatorial leadership style, lacking in professionalism, filters, and thoughtful analysis.  (Powell 27:17-24; Powell Ex. 1, p. 5).  She rated Plaintiff a "B" candidate, and in a detailed report recommended that Bukala not hire Plaintiff, stating: "While her results are undeniable, her style will create broken glass.  That, together with

a lack of analytic orientation, leads us to suggest you continue to seek an A player COO for the given scorecard." (Powell 22:5-19; Powell Ex. 1, p. 1).

Despite the opposition, Bukala decided to hire Plaintiff.  (Bukala Dec., ¶5).  He believed that the upside opportunity from Plaintiff's potential contributions to the company would offset the risks associated with her hire, and thought he could manage the behavioral concerns raised by Powell and other leaders.  (Bukala 93:25-94:3; 103:10-21; Bukala Dec., ¶5).  Bukala selected Plaintiff over several male candidates and assigned her the operations functions that were then being handled by a male employee (Jim Ford). (Bukala 71:12-72:8; 92:5-7; 93:17-18).

### B.    Plaintiff Clashes Almost Immediately with Colleagues and Bukala.

Plaintiff commenced working for FPG in October 2017.  At her request, she was not required to relocate to Orlando, but was expected to spend one week per month in Orlando and the remainder of her time visiting FPG locations or at her home office in Atlanta, Georgia. (Bukala Dec., ¶6).  As COO, Plaintiff oversaw all of FPG's funeral homes, crematories, and cemeteries, including the condition and safety of those facilities and their equipment.  (Pl. 58:12-60:22; Pl. Ex. 8).  Area Vice Presidents (AVPs) Chris Hamiel, Ben Farnstrom, and Andrew Clark reported to her.  (Pl. 60:23-61:5).

### 1.    Plaintiff Lies to Judge and Other Executives about Charette Offer.

Plaintiff recruited Ron Charette ("Charette"), a former colleague and long-time friend, to join FPG as Vice President of Sales.  (Pl. 101:22-102:5).  She told Judge that Bukala had authorized an offer for Charette with a compensation package in excess of $500,000. (Judge Dec., ¶4).  An offer of this amount would have made Charette the highest paid individual at FPG and required the approval of the compensation committee of FPG's Board.  *Id.* Judge scheduled a meeting between Plaintiff, Mike Doyle (VP of Revenue) and Richard Benton (CFO) to discuss the offer, during which Plaintiff repeated multiple times that Bukala had approved the offer terms for

3

Charette.  (Judge Dec., ¶¶5-6).  Judge, Doyle, and Benton determined that they should confirm the offer terms directly with Bukala.  (Judge Dec., ¶7).  Doyle called Bukala, who confirmed that he had never approved the terms Plaintiff had represented to them. (Bukala 296:16-297:2; 298:15-22; Judge Dec., ¶7).

### 2.     Plaintiff Misbehaves at Board Meeting, Embarrassing Bukala.

On November 9, 2017, Plaintiff attended FPG's quarterly Board of Directors meeting, which was most Board members' introduction to Plaintiff. (Bukala Dec., ¶9; McAllister Dec., ¶3). Throughout the meeting, Plaintiff bragged constantly about herself and her industry expertise, announcing she was "the best cremationist" in the country, and interrupted and talked over the other presenters.  (Bukala Dec., ¶9; Judge Dec., ¶8).  During a discussion about strategic priorities for 2018, Plaintiff projected an increase in FPG's annual preneed sales backlog to 6-times annual revenue, yet when probed for more details, she offered no data, statistics or a game plan to back up her projections, and merely spoke generally of developing a robust sales program.  (Bukala Dec., ¶¶9-10).  Plaintiff's behavior at the Board meeting was so embarrassing and disturbing that Bukala asked Plaintiff to step outside of the room and urged her to stop, telling her not to make promises on which she could not deliver and to stop grandstanding.[2]  (Bukala Dec., ¶10).

### 3.     Plaintiff Disparages FPG's Travel Policies.

During a meeting the week of October 16, 2017, Plaintiff told Kristina Martín ("Martín"), FPG's Manager of Business Support, that she only flies first class; Martín told Plaintiff that FPG policy permits only coach and economy domestic travel. (Martin Dec., ¶3).  Plaintiff ignored the policy and subsequently booked first class travel.  (Pl. 72:23-73:1).  When Bukala learned that

---

[2] After the Board meeting, McAllister met privately with Bukala to share his serious concerns about Plaintiff's behavior.  (McAllister Dec., ¶4).

Plaintiff was booking travel in violation of company policy, he reminded her of this policy. (*Id.*; Bukala Dec., ¶8). Plaintiff argued with Bukala, claiming it violated his prior assurance that she could travel first class. (Pl. 72:1-73:11; Bukala Dec., ¶8). Plaintiff testified that she would not have taken the job with FPG if she had known she would have to fly coach and "ride by the toilet [her] whole career." (Pl. 73:3-7; 75:23-25). Bukala made a special exception for Plaintiff to fly economy comfort, where offered. (Pl. 84:7-15; Pl. Ex. 17).

On November 15, 2017, FPG convened a call for leaders and managers to announce its partnership with Gant, a business travel management company. (Martin Dec., ¶4; Judge Dec., ¶9). Plaintiff quickly began disrupting the call, complaining that she did not approve of the travel program because it would require her and other employees to stay in "fleabag motels" that were unsafe and unsanitary. (Martin Dec., ¶¶5-6; Judge Dec., ¶9; Bukala Dec., ¶13). Bukala, again, had to intervene to stop Plaintiff's outbursts, and he later counseled Plaintiff that her conduct on the call was highly inappropriate and that she could have directed her concerns about the travel program to him offline. (Bukala Dec., ¶13).

### 4. Bukala Receives More Complaints about Plaintiff, Who Fails to Follow Through on Deliverables and Disparages FPG and Bukala.

Bukala continued to receive negative feedback about Plaintiff from senior leaders. (Bukala 291:25-292:2). Initially, he tried to encourage them to give Plaintiff more time to adjust to FPG; however, the complaints did not abate. (Bukala 293:2-4). In addition to Judge, Mike Doyle, Scott Ankerholz, Audrey Houck, and Richard Benton each also complained about Plaintiff. (Bukala 291:4-10). Three female employees complained to Judge about Plaintiff's conduct on weekly calls between Human Resources and the operations team. (Judge 148:12-149:5). The employees were uncomfortable with Plaintiff referring to herself as "Big Mama" and to her direct reports as her "boys." (Judge 149:16-17); (Pl. 91:9-12). One employee also complained to Judge that Plaintiff

was not modeling the values of relationship and FPG's five unique truths in the way she spoke to her team.  (Judge 149:19-150:4).

In November 2017, Bukala was compelled to intervene again and speak with Plaintiff after she circulated an overtly aggressive and hostile email attacking an advertising campaign and the marketing department's decision making.  (Bukala Dec., ¶14).  Bukala responded to Plaintiff's email, asking her not to jump to conclusions without the facts, make unwarranted assumptions about her colleagues, and respond in such a divisive, unproductive manner. (Pl. Ex. 14; Bukala Dec., ¶14).

After making only a few trips to FPG markets, Plaintiff informed Bukala in front of other employees that FPG needed to replace at least sixty to seventy percent of its retorts[3] and purchase state of the art new equipment. (Pl. 181:2-183:8; Bukala 143:6-13; 147:3-19; Bukala Dec., ¶15; Hamiel Dec., ¶8.). When Bukala asked Plaintiff for the basis of her conclusion, she replied that some of the retorts were old and should be replaced.  (Bukala Dec., ¶15).  Bukala told Plaintiff that, before the company could consider such an expensive multimillion dollar proposition, she would need to perform a detailed audit of the retorts.  (Bukala 143:17-22; 144:14-21; Bukala Dec., ¶15; Hamiel Dec., ¶¶8, 14).

Plaintiff subsequently provided only a list of crematory equipment owned by FPG and its age, but did not provide information about repairs, maintenance, condition, or safety. (Bukala 145:4-14). The information provided was not enough to assess whether hundreds of thousands of dollars should be incurred to replace each retort, so Bukala again requested that Plaintiff provide a detailed audit.  (*Id*; 150:14-23). Plaintiff never provided the data requested.  (Bukala 143:18-22; 144:14-145:14; Bukala Dec., ¶15).

---

[3] A retort is an industrial furnace used to cremate bodies.  (Pl. 59:20-60:1).

In meetings to discuss matters within the scope of her responsibility, Plaintiff often was unprepared and unfocused.  (Bukala Dec., ¶16; Judge Dec., ¶10). When Bukala asked Plaintiff what she would do to end 2017 on a strong note, Plaintiff had no response and said she had not yet had time to fix anything.  (Bukala Dec., ¶16; Judge Dec., ¶10).  In a meeting with other FPG executives to discuss preneed sales and a new sales compensation and commissions proposal, Plaintiff had no plans and provided no meaningful input.  (Judge Dec., ¶10).

Plaintiff regularly denigrated FPG's business and culture.  She criticized the number of direct reports under the AVPs, telling Judge "One ass can only ride one saddle." (Pl. 88:8-9; 88:24-89:5-7).  She criticized the company's sales performance, which she described as "on its knees." (Pl. 101:20-102:5). She criticized the number of conference calls FPG scheduled and the number of emails that FPG employees exchanged. (Pl. 132:17-19; 139:2-25; 230:13-17; 232:11-17; Hamiel Dec., ¶13; Bukala Dec., ¶7).  Judge tried to speak to Plaintiff regarding her unwillingness to read and respond to company emails, as Plaintiff's failure to approve an email had caused bonuses for her team to be delayed.  (Judge 101:11-102:4).  Plaintiff criticized FPG's acquisition strategy and told Bukala that the company should slow the acquisition pipeline and fix its current properties.  (Pl. 123:13-18; Hamiel Dec., ¶¶7,13). She acknowledged in testimony that she and Bukala often had "spirited conversations" in which they both raised their voices.  (Pl. 117:25-118:5).

Plaintiff also was extremely critical of Bukala, her boss, and openly disparaged him to her direct reports, including Chris Hamiel and Ron Charette, as well as to Board Member Kevin McAllister.  (Pl. 158:12-20; 327:9-330:6, Hamiel Dec., ¶¶5-7). She criticized Bukala's leadership as well as his industry experience, and questioned whether he was qualified to lead FPG.  (Pl. 144:1-3; Hamiel Dec., ¶5). In Plaintiff's own words, "What Bukala doesn't have and where he's

a fish out of water is he's never run, been in charge of, or successfully implemented a sales strategy at Foundation Partners or any other funeral company."  (Pl. 143:4-9). She said Bukala was "incredibly jealous of [her] long and tenured relationships in the industry" and "willingly and knowingly sought [her] out to discredit those [relationships]" by wanting to be included in her conversations with her industry contacts and copied on communications, and asking her what she had spoken to her contacts about. (Pl. 69:20-24; 70:21-71:5).  She also said Bukala was jealous of her cordial relationship with Board Member Kevin McAllister, whom she claimed sought her industry advice on an almost weekly basis. (Pl. 236:4-19; Dkt. 1, ¶¶30-31).  Plaintiff believed that she was better equipped than Bukala to determine the direction of FPG and that her industry knowledge and experience trumped Bukala's role and authority as CEO.  (Dkt. 1, ¶¶11-12, 20; Hamiel Dec., ¶¶13, 17).

### C.    Bukala Acknowledges Mistake, Decides to Terminate Plaintiff's Employment.

By mid-December 2017, Bukala was exhausted by the constant distractions created by Plaintiff's disruptive and unprofessional behavior, as well as her failure to follow through on deliverables. (Bukala Dec., ¶17).  Judge, too, was exhausted by Plaintiff's behavior, which she found to be disruptive, crass, unprofessional, and lacking in social executive norms and protocols. (Judge 100:21-24; Judge Dec., ¶11). Judge previously had spoken with Plaintiff about her propensity to view every criticism as a personal attack and tried to coach Plaintiff to modify her attitude and behavior, but to no avail.  (Judge 101:5-11).

On December 12, 2017, Bukala and Judge met, as they did on a regular basis, to discuss, among other things, the succession plan for Bukala's position.  (Bukala Dec., ¶18; Judge Dec., ¶11).  When Judge asked Bukala directly if he genuinely believed that Plaintiff could be his successor, Bukala responded, "no," conceding that his decision to hire Plaintiff was a mistake, and stating that he had decided to terminate Plaintiff's employment.  (Judge 89:7-21; Bukala 288:19-

23; Bukala Dec., ¶18).  Bukala explained that he had brought Plaintiff on as COO with the hope that she would make his job easier and that he could manage any behavior issues, but she was making his job more difficult with her disruptive behavior and her failure to provide a considered assessment regarding operations matters, including the audit of the retorts she claimed required replacement.  (Bukala 282:3-283:2).  Although it was important for Bukala to be aware of equipment and other operations concerns, it ultimately was Plaintiff's responsibility as COO to address them.  (Bukala 281:6-10; Pl. Ex. 8).  Bukala expected Plaintiff to be grounded in her facts and thoughtful in her recommendations and requests; she was not.  (Bukala 286:11-14).

Bukala told Judge that he planned to wait until after the holidays to inform Plaintiff of his decision, which would give him time to assess her projects, develop a plan for covering her duties, and inform McAllister of his decision to remove Plaintiff. (Bukala Dec., ¶19; Judge Dec., ¶11). Bukala also considered whether he would hire a new COO from the runner-up candidates from the previous search, begin a new search, or transition Plaintiff's duties among existing FPG employees. (Bukala Dec., ¶20; Judge Dec., ¶11).  After reviewing the previous candidates without identifying a clear choice, Bukala decided to transition Plaintiff's duties to existing FPG employees for the time being in lieu of beginning another expensive, time-consuming, and high-profile search for a new COO. (Bukala Dec., ¶20).

After meeting with Judge, Bukala contacted McAllister to schedule a time after the holidays to meet in person to discuss planned personnel changes.  (Bukala Dec., ¶21; McAllister Dec., ¶5).  They met in person in New York City on January 10, 2018, and Bukala informed McAllister of the constant conflicts and behavioral issues involving Plaintiff and his decision to terminate her employment.  (Bukala Dec., ¶22; McAllister Dec., ¶5).  McAllister expressed his full support for the decision.  (Bukala Dec., ¶22; McAllister Dec., ¶5).

**D.      Plaintiff Sends "Urgent" Email Complaining about Mausoleum and Cemetery Issues Already Being Addressed and Approved for Capital Expenditures.**

Among her failures to observe due diligence, on January 11, 2018, the day after Bukala's meeting with McAllister and nearly a month after Bukala made the decision to terminate, Plaintiff sent an email to Bukala and CFO Richard Benton attaching photographs from her recent visit to an FPG mausoleum and cemetery in South Carolina. (Pl. Ex. 22). She asserted that the property was neglected and an example of why FPG was "failing" and needed to retreat from its acquisition strategy.[4] *Id.* The photographs primarily show cosmetic issues, including holes in the ground marked by cones, fencing, or plywood coverings, and marks on the ceiling. (*Id.* at PLAINTIFF000025, 000036-38, 000041, 000043, 000047).  At the time of Plaintiff's visit and the January 11 email, however, FPG already had a plan in place to repair the mausoleum roof and the surrounding area that was affected by water runoff and had approved capital expenditures for the repairs. (Bukala 153:9-19; 189:18-23).  FPG had cordoned off certain areas affected by ground erosion to prevent tripping hazards.  (Bukala 155:12-23).  Bukala told Plaintiff that there were multiple repair projects underway at that property, the first of which involved repairing the mausoleum roof and fixing the drainage issues.  (Bukala 192:6-17).

**E.      Plaintiff Disrupts FPG's Senior Leadership Offsite Meeting.**

On January 18, 2018, FPG convened an offsite meeting for senior leaders and Area Vice Presidents to review important initiatives and operations. (Bukala 267:2-8; Judge 73:14-15).

---

[4]The email states: "I would like to discuss these photos at length.  Not only is the neglect of this park saddening, it is disgraceful and a poor representation of our Company.  Quite frankly, I am surprised we haven't been sued.  The burden that this has placed on our employees is very disheartening, but more so, as a long time cemeterian [sic] I am sick inside at [sic] we are serving up to paying families as acceptable. It is no wonder to me that we are failing.  I would like to discuss the following: 1) Emergency CapEx to begin repairs  2) We must have cremation inventory[.]  For me, I don't understand how we can keep tossing big multiples at new businesses when we are not protecting and taking care of the businesses we have.  By far, this way [sic] my saddest and most discouraging trip . . . ." (Pl. Ex. 22).

Bukala created an agenda prior to the meeting, along with a deck comprising slides submitted to him by various attendees.  (Pl. 110:5-6).  After circulating the initial agenda to the attendees, Bukala updated the agenda to include a brief presentation by Mike Doyle on feedback Doyle had received regarding regular operations meetings that began prior to Plaintiff's joining FPG. (Bukala 268:23-25; 271:15-19; 272:15-19). Doyle served as the financial partner for the operations group, and these meetings involved the finance and accounting departments as well as location leaders and AVPs, and focused on problem properties that were not meeting their financial goals and objectives.  (Bukala 268:7-8; 269:7-11; 273:13-15).

Plaintiff became infuriated and demanded that Doyle's presentation be stopped. (Pl. 111:1-7; Bukala Dec., ¶23).  She was livid that the agenda had been updated without notifying her and perceived that Bukala was "undermining her" by asking Doyle to present on an "operations" topic. (Pl. 110:5-113:1.) She verbally lashed out at Doyle until Bukala stepped in and told her she was out of line.  (Bukala 274:12-19; 275:17-21; 276:5-12; Farnstrom 201:3-202:3).   Notwithstanding Bukala's intervention, Plaintiff continued to angrily attack Doyle and Bukala and continued disrupting other presenters throughout the remainder of the meeting. (Bukala Dec., ¶23).

After the offsite, Judge gave Plaintiff a ride to the airport. (Judge 73:16-20).  Plaintiff was still furious, and told Judge that she thought that Bukala had undermined her in the meeting by changing the agenda after it had been distributed and allowing Doyle to present on operations matters. (Judge 78:13-19; 81:22-24).   Plaintiff told Judge that she thought Bukala also had undermined Judge by telling her that she was wrong in a meeting the day before when she had a different recollection of facts pertaining to an incentive plan issue.  (Judge 78:21-79:19).  Judge told Plaintiff she did not agree and did not believe that Bukala had undermined her.  (Judge 79:20-25). Judge explained to Plaintiff that, after that meeting, she had shared with Bukala the documents

that supported her position, and Bukala had apologized and acknowledged Judge was right.  (Judge 80:1-15).

Plaintiff told Judge that she thought Bukala had a problem with strong women.  (Judge 82:25-83:2).  When Judge asked Plaintiff to explain why she felt that way, Plaintiff complained about the Doyle presentation, and said the leadership meetings were poorly run, that Bukala had previously told Judge she was wrong, that Bukala was threatened by her relationship with Kevin McAllister, and that Audrey Houck ("Houck") (VP, Controller) agreed with her opinions about Bukala.  (Judge 83:21-23, 84:5-85:13).

Judge interviewed Houck the next day, who denied saying anything about Bukala to Plaintiff and said she disagreed with Plaintiff's views about Bukala.  (Judge: 85:17-86:1; 97:4-12).  Because Judge was present and had firsthand knowledge of what happened at the offsite (and had witnessed that it was Plaintiff who behaved inappropriately at the meeting), she concluded that Plaintiff's claims were unsubstantiated.  (Judge 83:23-84:4; 87:7-16).

### F.    Plaintiff Speaks to Bukala About Her Outbursts at the Offsite Meeting.

Plaintiff called Bukala the next day and told him that she felt horrible about what happened at the offsite, but that at the time, she felt undermined.  (Bukala 278:17-18).  Bukala assured Plaintiff that his intent had not been to undermine her as COO, and apologized if she had misinterpreted his intentions regarding Doyle's presentation.  (Bukala 270:15-16; 278:17-23).  Bukala later spoke with Judge about his conversation with Plaintiff, as well as Judge's conversation with Plaintiff the day before.  (Judge 94:11-17).  Judge told Bukala that Plaintiff said he had a problem with strong women, which Bukala rejected.  (Judge 99:5-15).  The same day, Plaintiff sent Bukala the following email:

> Just wanted to memorialize our conversation from this morning.  If we really are striving for a culture of mutual respect and trust, it is important to understand how blind-siding your executives undermines that culture.  Any time a direction change

needs to occur in operations, as agreed by you this morning, those decisions should
happen between me and you.  The fact that the agenda was changed without my
knowledge to address operations was wrong. . . . While I do accept your apology, I
am hopeful that there is coaching and another apology forthcoming.

(Pl., Ex. 69).  Plaintiff then forwarded that email to Judge, with the preface: "Please keep.  Making

progress.  I am hopeful, based on my conversation from Bob this morning, that the correction in

in [sic] place going forward and error was genuine.  (Judge Dec., ¶13, Ex. B).

### G.     Bukala Terminates Plaintiff's Employment.

Bukala also forwarded Plaintiff's email to Judge and told her that he was losing his

patience.  (Bukala 279:9-13).  Bukala spoke with Judge again that afternoon and told her that

Plaintiff's email completely mischaracterized their conversation and that he had explained to

Plaintiff that agendas get changed and that Doyle was the financial partner for the operations group.

(Judge 98:1-8).  Judge told Bukala that, given Plaintiff's continuing and significant disruption to

the organization, he should "expedite the inevitable" and follow through on the termination

decision that had been made in December.  (Judge 100:3-11; Judge Dec., ¶12).  Bukala agreed.

(Bukala 288:16-23; 290:10-18).

On January 21, 2018, Bukala and Judge called Plaintiff and terminated her employment,

telling her she was not a good cultural fit for FPG.  (Pl. 162:4-13).  Plaintiff told Bukala that the

real reason he was getting rid of her was "because [she] wasn't a liar like him" and her attorneys

would be in touch.  (Pl. 162:14-18).  Following the conversation, Plaintiff was sent a letter

memorializing her termination in accordance with her employment agreement. (Pl. Ex. 29).

### H.     After Termination, Plaintiff Files OSHA Retaliation Complaint.

Following termination, Plaintiff filed an OSHA whistleblower retaliation complaint with

the Department of Labor ("DOL"), alleging, under penalty of perjury, that she had "prepared an

audit report" on extensive repair issues, which "Bukala refused to let her present" or "escalate to

the board." (Pl. Dep. 168:6-170:1, Pl. Ex. 31).  No audit report was attached to the complaint.  (Pl.

Dep. 171:4-14). When asked for a copy, Plaintiff produced a document on FPG letterhead titled

"Draft Crematory Audit – FPG" dated "January XX, 2018." The document's hidden metadata,

however, revealed that the "audit report" had been created a month after Plaintiff's termination.

(Bukala Dec., ¶24, Ex. 1).  When confronted about the fabrication, Plaintiff's counsel sent a letter

to the DOL amending the complaint to delete references to the audit report as well Plaintiff's

claim that Bukala had refused to allow her to present the report or escalate it to the Board.[5] (Pl.

206:9-207:2). Plaintiff invoked the attorney-client privilege when asked about the inconsistencies

between her original sworn complaint and the unsworn amendment. (Pl. 208:1-215:10).

## II.      LEGAL ARGUMENT

### A.      Plaintiff Cannot Establish Discrimination.

Plaintiff alleges disparate treatment sex discrimination, inclusive of gender stereotyping,

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII")

[Dkt. 1, ¶1].  Disparate treatment claims brought under Title VII require proof of discriminatory

intent.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767-68 (11th Cir. 2005).  Accordingly,

where, as here, a plaintiff fails to present direct evidence of discrimination, the burden shifting

framework initially articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

applies, and Plaintiff must first present a *prima facie* case of discrimination by a preponderance of

the evidence.  *See e.g., Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1347

(11th Cir. 2007).  Plaintiff cannot satisfy this burden.

---

[5] Plaintiff subsequently admitted at deposition that the only report that had been prepared at the time of her separation was the crematory report identifying the retorts owned by the company and their ages.  (Pl. 180:3-19).

### 1.     Plaintiff Cannot Establish A *Prima Facie* Case of Discrimination.

Plaintiff must first establish a *prima facie* case of discrimination by termination, by showing that (1) she was a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified to do the job; and (4) she was replaced by a person outside the protected class or, in the alternative, can identify similarly situated comparators outside the protected class who were treated more favorably.  *Horn v. United Parcel Service, Inc.,* 433 Fed. Appx. 788, 792 (11th Cir. 2011).  For purposes of summary judgment only, Defendant will focus on Plaintiff's inability to satisfy the fourth element of the *prima facie* case.[6]

Plaintiff seeks to establish her *prima facie* case by alleging that she was replaced by Andrew Clark ("Clark"), whom Plaintiff characterizes as a "less qualified male."[7]  [Dkt. 1, ¶70].  Clark, however, has never held the role or received the compensation of COO with FPG. Rather, in July 2018, approximately six months after Plaintiff's termination, Clark was promoted to Chief Customer Officer ("CCO"). (Clark 29:9-19).  After terminating Plaintiff, Bukala separated the duties of the COO position into an operational Chief Customer Officer and an operational finance role.  (Clark 30:4-8).  Plaintiff's responsibilities as COO were much broader than those Clark currently has, and Clark's annual salary is approximately $75,000 less than Plaintiff's salary. (Bukala 177:6-24; Bukala Dec., ¶25).  Clark is responsible for field operations of FPG's funeral homes, crematories, and cemeteries, and oversees cemetery sales and organizational development. (Clark 32:22-33:12). However, he does not have the significant duties of preneed sales that Plaintiff had.  (Bukala 52:23-55:20).  Accordingly, Clark's position is not the same position held

---

[6] Although not primarily relied upon for summary judgment purposes, FPG easily could rely upon the fact that a person in a COO position who disparages the company and openly criticizes its CEO, all within three months of hire, is fundamentally unqualified for her job.

[7] Far from being "lesser qualified," Clark is an industry veteran who has been appointed to the Board of Funeral, Cemetery, and Consumer Services for the State of Florida since 2011.  (Clark 19:6-20:8).

by Plaintiff, and he did not replace her.  Indeed, the six-month time lapse between Plaintiff's termination and Clark's promotion to CCO is further evidence that Clark did not replace Plaintiff. *See Vertrees v. American Vulkan Corp.*, 2012 WL 95306 at *5 (M.D. Fla. 2012) ("Plaintiff was not *immediately* replaced by Hildebrand, and as such, the Court is not persuaded that Plaintiff has shown that he met the fourth element – that he was replaced by a younger employee."); *see also Rose v. Wells Fargo*, 902 F. 2d 1417, 1422 (9th Cir. 1990) (noting that the fact that the plaintiff's responsibilities were not assumed by a younger co-worker until six or seven months after plaintiff's discharge 'substantially weaken[s]' his claim.")

Nor can Plaintiff establish that she otherwise was treated differently than any male employee.  Plaintiff's evidence must establish that the alleged comparators were "'involved in or accused of the same or similar conduct and [were] disciplined in different ways.'"  *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).  By Plaintiff's own testimony, she had little respect for Bukala as an executive or FPG as a company.  She has not identified any male executive of FPG who was rude, disruptive, confrontational, unprofessional, and insubordinate but was not separated from employment.  Rather, Plaintiff alleges (as part of her relentless crusade to disparage Bukala's reputation) that Bukala surrounded himself with "yes men" who would not challenge his decisions. (Pl. 128:8-16).  Indeed, not only did Plaintiff manifest no contrition or remorse for her three-plus months of poor behavior, she was proudly defiant at her depositions regarding her belligerence toward Bukala.

### 2.   FPG Has Articulated a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff.

Even if Plaintiff *could* establish a *prima facie* case of sex discrimination, the burden would shift to Defendant to articulate a legitimate, nondiscriminatory reason for its actions.  This burden

is merely one of "production, not persuasion," and it "involve[s] no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  If Defendant sustains this "exceedingly light" burden of production, *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994), the burden returns to Plaintiff to prove by a preponderance of the evidence that "the legitimate reasons offered by [Defendant] were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  For all of the reasons discussed at pp. 1-14, Plaintiff's abrasive management style resulting in repeated clashes with colleagues and Bukala was a legitimate non-discriminatory reason for her termination.

### 3.    Plaintiff Cannot Establish Pretext.

To prove pretext, Plaintiff "must provide sufficient evidence to permit a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for [the challenged action] by (1) showing that the legitimate nondiscriminatory reasons should not be believed; or (2) showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons." *Standard*, 161 F.3d at 1332.  Plaintiff must come forward with enough evidence to establish that Defendant's reasons were so "unworthy of credence" that a reasonable factfinder could infer that Defendant actually concealed its true discriminatory motive. *See Reeves*, 530 U.S. at 147-48.  Conclusory allegations of discrimination, without more, are insufficient to establish pretext. *See Coutu v. Martin Cnty. Bd. of Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995).  As explained below, Plaintiff cannot satisfy this burden.

Defendant has set forth compelling, legitimate, nondiscriminatory reasons for terminating Plaintiff – a clash with FPG's corporate culture in a position slated to assume the position of FPG's CEO.  Plaintiff's own testimony denigrates nearly every aspect of FPG and its leadership team,

17

making this conflict indisputable. Furthermore, Plaintiff cannot possibly establish pretext, as her "evidence" is her own mere speculation that Bukala did not like "strong women" in general, or her specifically, which is contradicted by the undisputed fact that her assertiveness was abundantly clear during the interview process and Bukala nonetheless decided to hire her instead of male candidates, against the counsel of his colleagues.  Plaintiff has not alleged any comments about her gender made by Bukala or anyone else at FPG.  Her only "evidence" that is even remotely linked to her gender is an allegation that she was not invited to play golf with Bukala, Doyle, and members of the Board of Directors in her first month with FPG. (Pl. 130:8-24; Dkt. 1, ¶29). Bukala, however, has only played golf with certain Board members on two occasions during his eight-year tenure with FPG.  (Bukala Dec., ¶12).   Plaintiff alleges that when she asked Bukala about the outing, he told her that she should consider joining a book club like his wife. (*Id.*; *see* Hamiel Dec., ¶11).  Although Bukala denies stating this, the alleged isolated comment is nothing more than a stray remark and insufficient to establish pretext.[8]  *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989) (O'Connor, J., concurring).

While Plaintiff may argue that certain actions by FPG were unfair, her subjective belief that she should not have been terminated is insufficient to raise a genuine issue of fact as to pretext. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.")  As long as the employer's reason is not

---

[8] Tellingly, Bukala made both the decision to hire Plaintiff and then also to terminate her, within three months of each other. *See Aldabblan v. Festive Pizza, Ltd.*, 380 F. Supp. 2d 1345, n. 7 (S.D. Fla. 2005) ("[W]hile the Court will not apply a presumption of non-discrimination based on the fact that Mr. Spencer both hired and fired Plaintiff within a 7 month period, this fact does strongly suggest that the reason for Plaintiff's discharge was his performance, and not his age.")

discriminatory or retaliatory, the "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all[.]"[9]  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). Plaintiff's own self-serving conjecture is not adequate proof of pretext, nor is her hearsay claim that Julie Judge purportedly told her that "Bob hates women." (Pl. 218:5-7).

By mid-December 2017, Bukala possessed substantial, concrete evidence that Plaintiff was not a good fit for FPG and could not serve as his successor, and that her termination was justified. *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1228 (11th Cir. 1993) ("An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination.")

### B.    Plaintiff Cannot Establish Retaliation.

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) that there was some causal relation between the two events.  *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  Plaintiff appears to allege three possible protected activities: (1) her objection to Mike Doyle's presentation at the January 2018 leadership meeting (Dkt. 1, ¶56); (2) her conversation with Judge after the meeting on the way to the airport; and (3) her conversations and email with Bukala (forwarded to Judge) on January 19, 2018 (Dkt. 1, ¶67). However, the only activity in which Plaintiff even alluded to gender discrimination was her conversation with Judge.  She claims that her termination was in retaliation for her complaints and/or because she was a "strong" woman. Plaintiff's retaliation claim fails under the first and

---

[9] And, of course, FPG's practices were not medieval, its decisional process was not high-handed, and its managers were not mistaken.

third elements of her *prima facie* case.

### 1.    Plaintiff Did Not Engage in Protected Activity.

In order to establish statutorily protected activity under Title VII, Plaintiff must establish that she had a good faith, reasonable belief that FPG was engaged in unlawful employment practices. *See e.g. Harper v. Blockbuster Entertainment Corp*., 139 F. 3d 1385, 1388 (11th Cir. 1998). Under this standard, Plaintiff must show (1) that she subjectively believed that she was being discriminated against; and (2) that her belief was objectively reasonable in light of the facts and record under existing substantive law. *Adams v. Cobb Cty. Sch. Dist*., 242 F. App'x 616, 621 (11th Cir. 2007). For purposes of summary judgment only, Defendant will not dispute that Plaintiff subjectively believed that she had been discriminated against. However, Plaintiff cannot establish that such belief was objectively reasonable.

All three of Plaintiff's purported complaints involved the same conduct: Bukala's decision to ask Doyle to present at the leadership offsite regarding meetings that he held in his capacity as the financial partner for the operations group during the previous quarter. Under even the most lenient interpretations of Title VII, this would not constitute protected activity. Notwithstanding Plaintiff's gross overreaction to Bukala's changing the meeting agenda, this is a far cry from a materially adverse employment action. Title VII is neither a "general civility code," nor does it make the "ordinary tribulations of the workplace" actionable. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Rather, to qualify as an adverse employment action under Title VII's anti-discrimination clauses, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id*. "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must

be materially adverse as viewed by a reasonable person in the circumstances." *Id.  See Davis*, 245 at 1242 ("Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace.")  Thus, the complaint about Bukala's changing the agenda could not have been protected activity under Section 704(a) because the subject matter of the complaint was trivial.

### 2. Plaintiff Cannot Establish A Causal Connection Between Her Alleged Protected Activity And Her Termination.

Apart from whether Plaintiff's complaints in January 2018 constituted protected activity under Section 704(a), she still cannot establish a causal connection between such complaints and her termination.  Notwithstanding the conflicting allegations in her Complaint, the decision to terminate Plaintiff's employment was made on December 12, 2017, more than a month before Plaintiff's "complaints."  It is undisputed that Judge and Bukala met on that date and determined that Plaintiff would have to be terminated.   On January 10, 2018, Bukala met with McAllister and told him of his decision to terminate Plaintiff.   This decision was merely implemented on January 21, 2018 as the direct result of Plaintiff's inappropriate conduct at the January 18, 2018 offsite.  Because the decision had been made before Plaintiff's complaints, she cannot establish a causal connection between her complaints and the termination decision.  *See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.") (quoting *Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001)); *Shannon v. Nat'l Railroad Passenger Corp.*, 774 Fed. Appx. 529, 543 ("[W]here an employer decided to take a materially adverse action before the employee engaged in a protected expression, the two cannot be causally connected.") (citing *Cotton*, 434 F.3d 1227).

The fact that Bukala and Judge did not set a date certain for Plaintiff's termination when

they spoke in mid-December is of no consequence, because Plaintiff engaged in precisely the same conduct at the January 18, 2018 offsite that led to the decision to terminate her in December, and in no way was it protected activity under 704(a).

> ### 3.     The Legitimate, Non-Retaliatory Reasons for Plaintiff's Termination Are Not Pretextual.

As addressed in Section II.A.2 and A.3 above, FPG had legitimate, non-retaliatory reasons for Plaintiff's termination, and those reasons were not pretextual.

### C.     Plaintiff Cannot Establish a Claim for Whistleblower Retaliation.

The Florida Private Whistleblower Act ("FWA") states "An employer may not take any retaliatory personnel action against an employee because the employee has: . . . (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."  Fla. Stat. 448.102(3).  The FWA is analyzed using the same burden-shifting protocol under which Title VII retaliation claims are analyzed.  *See Rutledge v. SunTrust Bank*, 262 Fed. Appx. 956, 957-58 (11th Cir. 2008).

> ### 1.     Plaintiff Cannot Establish a *Prima Facie* Case.

To establish a *prima facie* case under the FWA, Plaintiff must show that: (1) she engaged in a statutorily protected activity by objecting to or refusing to participate in any activity, policy or practice of FPG that was in actual violation of an adopted law, rule or regulation; (2) she has suffered an adverse employment action; and (3) the adverse employment action was causally linked to the statutorily protected activity.  *See Bell v. Ga.-Pac. Corp.*, 390 F. Supp. 2d 1182, 1187-88 (M.D. Fla. 2005).   As with her Title VII retaliation claim, Plaintiff cannot establish the first or third prongs of this *prima facie* case.

> #### a.     Plaintiff Did Not Engage in Protected Activity.

Plaintiff's purported FWA claims have been marked by hyperbole and lack of specificity.

Her Complaint alleges "numerous safety violations and non-compliance issues at FPG facilities" (Dkt. 1, ¶32) and "continuous" objections and advocacy for capital expenditures (*Id.*, at ¶33), and pleads thirteen paragraphs of "issues" she allegedly observed as part of her review of FPG's operations. (*Id.*, at ¶¶36-46, 50-51). However, she has identified only two "complaints" with some level of specificity: (1) her January 11, 2018 email regarding her visit to the mausoleum and cemetery in South Carolina, and (2) her discussions regarding the condition of FPG's crematories. Neither of these complaints constitutes protected activity under the FWA, as Plaintiff cannot identify any law, rule, or regulation that was actually violated by FPG. The Middle District of Florida has consistently held that the FWA's requirement that an employee identify an *actual* violation of a law, rule or regulation is "unequivocal." *Graddy v. Wal-Mart Stores East, LP*, 237 F. Supp. 1223, 1227 (M.D. Fla. 2017) (citing *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 462 (Fla. 2d DCA 2015). Despite Plaintiff's apparent strategic decision to throw everything at the wall to see what sticks, she has not identified any actual legal violations. When asked at her deposition to identify the specific laws, rules, or regulations she claimed were violated, she identified only "slip and fall," employees working all night in a "hazardous" environment, "heat exhaustion," and "PPE." (Pl. 344:10-345:12). However, only "slip and fall" was potentially included in the complaints Plaintiff has actually specifically identified, and the locations in the photographs that Plaintiff provided to Bukala on January 11 clearly show cones, orange fencing, and boards marking off the holes on the property. Nor has Plaintiff proffered any proof that the issues on the property in question were ratified or ignored by FPG or Bukala. Indeed, Bukala testified that there already were plans in place to address the issues created by the roof leaking at the mausoleum property, about which he told Plaintiff and subsequently scheduled a meeting between Plaintiff and Benton to discuss. (Bukala 189:18-23; 192:6-193:11; Pl. 186:5-9).

Similarly, when Plaintiff voiced concerns regarding the condition of the crematory equipment, Bukala asked her for supporting information, in the form of an audit reflecting the ages, conditions, and fuel efficiencies of the retorts, and her recommendations for repair or replacement, with specific costs.  Despite requesting this information in October, and despite the fact that Andrew Clark had already commenced this project even before Plaintiff was hired, she never completed the project.  (Clark 117:9-23).

Finally, uncontroverted FPG records demonstrate that the company spent millions on capital expenditure repairs, before, during, and after Plaintiff's employment, which evidences FPG's investment in the safety and maintenance of its properties.  (Pl. Ex. 61-66; Hamiel Dec., ¶14).  Requests for capital expenditures of the kind Plaintiff alleges that she was "pushing for" are submitted through formal requests. (Bukala 193:6-194:18).  Few, if any, of the requests between October 15, 2017 and January 20, 2018 bear Plaintiff's name, although virtually all of the requestors reported to her.  Plaintiff cannot point to a single request that she made that was rejected outright by Bukala or anyone else at FPG.  Indeed, the testimony established that FPG routinely approved capital expenditures and that requests relating to safety or emergency issues received the highest priority. (Clark 190:22-191:6).

### b.     Plaintiff Cannot Establish Causation.

Even if anything Plaintiff said might tenuously be considered protected activity, the record is devoid of any evidence that such statements had any bearing on the decision to terminate her employment, which was made December 12, 2017, or the action of implementing that decision on January 21, 2018.

2.    **The Manager's Rule Bars Plaintiff's FWA Claims Because She Raised the Purported Safety and Compliance Issues In the Normal Course of Her Duties as FPG's COO.**

The record is undisputed that Plaintiff was performing duties as COO when she raised the purported safety and compliance issues and, therefore, under the "manager rule," she did not engage in protected activity.  *See Brush v. Sears Holdings Corp.*, 466 F. App'x 781 787 (11th Cir. 2012) (affirming dismissal because management employee did not engage in protected activity when her report occurred in the course of her normal job performance).  As there are no facts showing that Plaintiff "cross[ed] the line from being an employee 'performing her job . . . to an employee lodging a personal complaint,'" she did not engage in protected activity.  *Id.* (internal citations omitted).

The courts have granted summary judgment on whistleblower retaliation claims in favor of employers where the alleged protected activity occurred while the employee was simply performing her everyday expected job duties.  Thus, in *Brush*, the Eleventh Circuit affirmed the district court's grant of summary judgment on the plaintiff's Title VII claim, holding that the plaintiff had not engaged in statutorily protected activity because of the manager rule. *Brush*, 466 F. App'x at 787, 789.  The plaintiff had worked in loss prevention for the employer and was charged with minimizing risk and protecting assets, including its employees.  *Id.* at 783.  After the plaintiff was discharged, she claimed the company retaliated against her after she completed a sexual harassment investigation and discovered the company had failed to address several sexual assaults that had occurred in the workplace.  *See id.* at 784, 788.  The court found in favor of the company, reasoning as follows:

> Considering the facts adduced by the parties in light of the "manager rule," there can be no dispute that Brush acted solely as a manager here.  In her capacity as an investigator of Mrs. Doe's sexual harassment claim, Brush informed Sears of Mrs. Doe's allegations, investigated those allegations, and reported the results of her

> investigation to Sears.  Brush's job responsibilities involved exactly the types of actions that Brush took on Mrs. Doe's behalf.  There is simply no evidence in the record that Brush was asserting any rights under Title VII or that she took any action adverse to the company during the investigation.

*Id.* at 787; *see also Wolf v. Pac. Nat'l Bank,* No. 09-21531, 2010 WL 5888778, at *10 (S.D. Fla. Dec. 28, 2010) (report and recommendation) ("It is well-established in federal whistleblower cases that a plaintiff does not engage in protected activity by disclosing violations of law as part of his job responsibilities."), *adopted*, 2011 WL 772853 (S.D. Fla. Feb. 28, 2011); *Goodwin v. Dyncorp Int'l, LLC*, 2015 WL 12672085, (N.D. Fla. 2015) (Judge Vinson, holding that summary judgment in defendant's favor on plaintiff's FWA claims was "clearly appropriate" under the manager rule). Given the broad scope and high level of Plaintiff's duties as COO, the items of which she allegedly complained were clearly within the scope of her regular role at FPG.  The application of the manager rule is further underscored by the fact that when Plaintiff *did* step outside her role and complain to OSHA, the complaint was devoid of any of these specific allegations and focused only on her termination.

### 3.    FPG had a Legitimate, Non-Retaliatory Reason for Terminating Plaintiff's Employment, which was Unrelated to Any Conduct Allegedly Protected under the FWA.

Even if Plaintiff could establish a *prima facie* case for retaliation, the FWA is clear: "An employee may not recover in any action brought pursuant to this subsection [of the FWA] if … the retaliatory personnel action was predicated upon a ground other than the employee's exercise of a right protected by this act." Fla. Stat. 448.103(1)(c).  In rebutting Plaintiff's *prima facie* case, FPG need only produce credible evidence supporting its legitimate reasons.  The employer does not bear the burden of persuasion.  That burden remains with Plaintiff and is carried only with evidence that the Plaintiff's engagement in protected activity was a *significant factor* in the employer's decision. *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501-02 (11th Cir. 1990) (emphasis

added).  As previously discussed, FPG had a legitimate, non-retaliatory reason for Plaintiff's termination.  FPG has therefore met its intermediary burden; and any presumption of retaliation by the *prima facie* case "simply drops out of the picture;" and the burden of proof shifts back to Plaintiff.

### 4.    Plaintiff Cannot Establish Pretext for Retaliation.

Plaintiff must come forward with "significant probative evidence of pretext, not mere conclusory allegations.  Further, the focus is on the employer's beliefs rather than the employee's own perceptions."  *Lockett v. Choice Hotels Int'l, Inc*., 315 Fed. Appx. 862, 868-69 (11th Cir. 2009).  Plaintiff cannot meet this burden, as she cannot point to *any* evidence of pretext in FPG's decision.  As discussed above, Plaintiff cannot point to any employee of FPG who was treated differently.  Plaintiff implies that certain changes implemented by FPG after her termination, such as a more centralized OSHA training program or the implementation of centralized annual maintenance, could suggest pretext. However, to the contrary, such actions simply underscore the fact that FPG takes safety very seriously and that any "complaints" found to be made by Plaintiff played no role in the decision to terminate her employment.

## III.    CONCLUSION

For the reasons set forth above, FPG is entitled to summary judgment dismissing Plaintiff's claims as a matter of law.

*[Signature Lines On Following Page]*

Dated:  July 31, 2020.

Respectfully submitted,

/s/ Peter W. Zinober
_____

SUNDRIA R. RIDGLEY
Florida Bar No. 1007715
Sundria.Ridgley@foundationpartners.com
Senior Vice President & General Counsel
Foundation Partners Group, LLC
4901 Vineland Road, Suite 300
Orlando, Florida 32811
Telephone:  407.735.9003
Facsimile:  407.884.7400
*OF COUNSEL*

PETER W. ZINOBER
Florida Bar No.: 121750
peter.zinober@ogletree.com
GRETCHEN M. LEHMAN
Florida Bar No.: 46365
gretchen.lehman@ogletree.com
**OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.**
100 North Tampa Street, Suite 3600
Tampa, FL 33602
Telephone: 813.289.1247
Facsimile:  813.289.6530

*ATTORNEYS FOR DEFENDANT
FOUNDATION PARTNERS GROUP, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by electronic filing via CM/ECF Electronic Notification on this 31st day of July, 2020 on all counsel or parties of record who have appeared in this case.

**I FURTHER CERTIFY** that to the best of my knowledge there are not any non-CM/ECF participants who have appeared in this case that require notification of this response via First Class U.S. Mail.

/s/ Peter W. Zinober
_____
Attorney

43724276.1

28